## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-60764-CIV-LENARD/GOODMAN

**SONEET KAPILA, as the Chapter 7**
**Trustee of the Geoffrey Edelsten**
**Bankruptcy Estate,**

     Plaintiff,

**v.**

**MATTHEW MILITZOK and**
**MILITZOK & LEVY, P.A.,**

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS II, IV, AND V OF PLAINTIFF'S COMPLAINT (D.E. 13)

     **THIS CAUSE** is before the Court on Defendants Matthew Militzok and Militzok & Levy, P.A.'s ("Defendants") Motion to Dismiss Counts II, IV, V of Plaintiff's Complaint or Alternative Motion for More Definite Statement, ("Motion," D.E. 13), filed June 16, 2015. Plaintiff, Soneet Kapila, as the Chapter 7 Trustee of the Geoffrey Edelsten Bankruptcy Estate ("Plaintiff"), filed a Response on July 21, 2015, ("Response," D.E. 16), to which Defendants filed a Reply on July 31, 2015, ("Reply," D.E. 18). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

## I.     Background[1]

Defendant Matthew Militzok is an attorney with Defendant law firm Militzok & Levy, P.A.  (Compl. ¶¶ 8-10.)  Soneet Kapila is suing Defendants on behalf of the Bankruptcy Estate of Geoffrey Edelsten for negligently advising and representing Edelsten in connection with his business disputes and for failing to advise Edelsten of "the monumental conflict of interest which arose out of their joint representation of Edelsten and his partners[.]"  (Id. ¶ 1.)

Defendants represented Edelsten in various transactions, and then business disputes, involving Rafael, Limor, and Isaac Keith Mawardi ("the Mawardis").  (Id. ¶ 11.)  Defendants represented the Mawardis at the same time they represented Edelsten. (Id.)  Edelsten was never advised of—and therefore never waived—the potential and actual conflicts of interest which were implicated by the joint and concurrent representation of the Mawardis and Edelsten.  (Id.)

The relationship between the Mawardis and Edelsten began years ago and included an eight-figure-sum worth of assets, including (a) the Nurielle Joint Venture, a proposed world-wide fashion empire; (b) the Millennium Property, a Florida residence with substantial equity; (c) the 4142 property, a Florida commercial property owned free and clear of any mortgage; (d) the Resort Property, another Florida commercial property owned outright; (e) the Nuireele Airplane, to oversee the parties' assets; (f) the Investments' Property, a commercial property in Tennessee, with an insurance claim that

---

[1]     The following facts are gleaned from Plaintiff's Complaint (D.E. 1) and are deemed to be true for purposes of ruling on Defendants' Motion.

was left pending in Florida; (g) the Altels Property, a commercial property in Ohio; and (h) the Dominican Republic properties, a casino with some related properties and option rights (collectively, the "Nurielle Properties").  (Id. ¶ 12.)

Pursuant to the parties' joint venture agreement, Edelsten was primarily the "money man" and the Mawardis handled the day-to-day operations of the Nurielle Properties.  (Id. ¶ 13.)   At the same time, but without advising them of any potential conflict nor obtaining any waivers of same, Defendants represented both the Mawardis and Edelsten in connection with this joint venture.  (Id.)   During this period, Edelsten repeatedly directed the Defendants to make sure his investments of substantial funds were properly secured in each of the investments.  (Id.)   For example:

a)  On October 24, 2011, Edelsten advised Militzok in writing that he only authorized Militzok to close on the Investments Property subject to Edelsten's investment funds having a secured first mortgage on the property, which they had previously discussed;

b)  On November 9, 2011, Edelsten advised Militzok in writing that Edlesten only authorized Militzok to pay the deposit on the Altels Property, subject to Militzok ensuring that Edelsten obtains sole title to property or title to the property is vested in a corporation in which he is the sole shareholder and director;

c)  On November 9, 2011, Militzok responded to Edelsten, questioning how he could get sole title to the property seeing as he had previously advised that the agreement between Edelsten and the Mawardis should be a 43% - 43% split ;

3

d) On November 9, 2011, Edelsten advised Militzok that although he agreed with the corporate structure, prior to actually infusing funds, it was "critical" that he obtain "total security" for the funds he advanced for the subject real and personal property that he purchased, such that Edelsten would be paid back before any profits were distributed to other shareholders;

e) On November 9, 2011, Militzok responded to Edelsten, advising that merely placing the third partner's shares in escrow would fulfill Edelsten's direction to obtain "total security" over his investments;

f) On November 9, 2011, Militzok advised Edelsten that, although he was content with the corporate structures and arrangements, Edelsten still required that the funds he advanced be secured by mortgages, security agreements, or some similar instrument;

g) On November 9, 2011, Militzok attempted to persuade Edelsten to not use a mortgage because it would add costs and "complicate refinancing efforts";

h) On November 9, 2011, Edelsten again directed Militzok in writing that he needs his funds advanced to the joint venture to be secured and safe, and that his understanding was that mortgages would be the best way to do that;

i) On November 12, 2011, notwithstanding Edelsten's clear directions to place a mortgage based on Militzok's own advice, Militzok advised Edelsten that all his concerns regarding investment security would be covered by an operating agreement;

4

j)   On November 23, 2011, Edelsten advised Militzok that only subject to the concerns for security that he raised repeatedly with Militzok, Edelsten authorized payment of the deposit for the purchase of the Altels Property—i.e., that either a mortgage was being placed on the property or the property would be first purchased in a company wholly owned by Edelsten, until such time that his investment is fully repaid and then the joint venture profit split could begin;

k)   On February 17, 2012, Edelsten again advised Militzok in writing that Militzok could only release additional funds from his escrow account, provided the funds were secured in a similar fashion as the original investments in the Nurielle Properties discussed above—i.e., a mortgage on the subject property or the property being titled in an entity of which Edelsten is the sole and controlling owner.

(Id. ¶ 13.)  None of Edelsten's investments in the Nurielle Properties were secured with any mortgages, nor were the properties ever titled in a company of which Edelsten was the sole owner and controller.  (Id. ¶ 14.)  The Complaint alleges that Militzok ignored Edelsten's instructions because Defendants were only acting on behalf of the Mawardis, who would necessarily benefit if the transactions were not properly documented or secured, or were such that the Mawardis could share in revenue prior to Edelsten being repaid his full investment.  (Id.)

Because the joint venture investments brokered by Defendants were not properly documented, structured, or secured, the relationship between the Mawardis and Edelsten quickly turned sour.  (Id. ¶ 15.)  The Mawardis, believing that Edelsten materially

5

breached his obligation relating to the Nurielle Properties, initiated suit in Broward County, Florida.  (Id.)  Edelsten and the Mawardis were also involved in heavy and contentious litigation in Tennessee state court and federal court in Florida.  (Id. ¶ 16.) Ultimately, because Defendants failed to properly document and secure Edelsten's investments in the Nurielle Properties, which investment funds ran through Defendants' trust account, Edelsten was forced to settle with the Mawardis on disadvantageous terms, file for bankruptcy, pay massive attorneys' fees and costs, and was left with almost nothing from his substantial infusion of funds.  (Id.)

As a direct and proximate result of Defendants' misconduct, Edelsten has incurred substantial damages, including: (a) the loss of millions of dollars that Edelsten invested in or loaned the Nurielle Properites; (b) the loss of monies paid to Defendants for services which were not performed on his behalf, were performed with gross negligence, or were performed contrary to Edelsten's interests or directions; (c) a devaluation of his equity interest as a member of the entities that owned or controlled the Nurielle Properties; and (d) additional attorney's fees and costs Edelsten has incurred to rectify the effects of Defendants' misconduct.  (Id. ¶ 18.)

On April 9, 2015, Plaintiff brought this action against Defendants alleging professional negligence (Count I), breach of contract (Count II), breach of fiduciary duty (Count III), constructive fraud (Count IV), and a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count V).  Defendants move to dismiss Counts

II, IV, and V of the Complaint.  (D.E. 13.)  Alternatively, they seek a more definite statement.  (See id.)  The Court has jurisdiction pursuant to 28 U.S.C. § 1334.[2]

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint (or a portion thereof) for "failure to state a claim upon which relief can be granted."  In reviewing a motion to dismiss, the Court must accept the factual allegations as true and construe them broadly in the light most favorable to the plaintiff.  See Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss.  Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.; see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard).  Furthermore, courts may make reasonable inferences in a

---

[2]      Title 28, United States Code, section 1334 "gives a district court jurisdiction of proceedings 'arising under; the Bankruptcy Code, 'arising in' a debtor's bankruptcy case, or 'related to' the bankruptcy case."  In re Hospitality Ventures/LaVista, 358 B.R. 462, 470 (Bankr. N.D. Ga. 2007).  "As stated in Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984), the usual test of whether a proceeding is 'related to' a bankruptcy case is 'whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"  Id.  "The Eleventh Circuit adopted this test in Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.), 910 F.2d 784, 787–88 (11th Cir. 1990).  The Supreme Court has noted that causes of action owned by the debtor which become property of the estate are "related to" a bankruptcy case.  Celotex Corp. v. Edwards, 514 U.S. 300, 307 n.5 (1995).  The Parties do not dispute that this case arises under, arises in, or is related to In re Edelsten, Case No. 14-19613-JKO 30054 (the "Bankruptcy Case").

plaintiff's favor, but they are not required to draw the plaintiff's inference.  Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009).  The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 679).  Finally, the Court's "analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto." Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir. 1997) (citation omitted).

Under Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  "As the formidable standard set forth in Rule 12(e) suggests, '[m]otions for more definite statement are viewed with disfavor and are rarely granted.'"  Abrams v. CIBA Specialty Chems. Corp., Civil Action No. 08-0068-WS-B, 2008 WL 4183344, at *2 (S.D. Ala. Sept. 10, 2008) (quoting Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel or Vessels, 352 F. Supp. 2d 1218, 1221 (S.D. Ala. 2005)).  "The propriety of granting such a motion lies completely within the sound discretion of the trial court."  United States v. Metro Dev. Corp., 61 F.R.D. 83,

85 (N.D. Ga. 1973) (citing Mitchell v. E-Z Way Towers, Inc., 269 F.2d 126, 130 (5th Cir. 1959)).[3]

## III.   Discussion

Defendants move to dismiss Count II for breach of contract, Count IV for Constructive Fruad, and Count V for violating FDUTPA.  (D.E. 13.)  The Court will discuss each in turn.

### a.   Count II: breach of contract

In Florida, the elements of a claim for breach of contract are: (1) a valid contract, (2) a material breach, and (3) damages.  Vozzcom, Inc. v. Beazley Ins. Co., Inc., 666 F. Supp. 2d 1321, 1327 (S.D. Fla. 2009) (citing Brooks Tropicals, Inc. v. Acosta, 959 So. 2d 288, 292 (Fla. Dist. Ct. App. 2007)).  Defendants argue that "[a]lthough the Complaint alleges the existence of an attorney-client relationship, the Complaint does not allege the existence of any contract that gives rise to an attorney-client relationship."  (Mot. at 3-4.)  Plaintiff argues, and the Court agrees, that "[t]his is simply incorrect."  (Resp. at 8.)

The Complaint alleges that "[t]he attorney-client relationship between Defendants and Plaintiff was created by a binding contract between the parties."  (Compl. ¶ 26 (emphasis added).)  It further alleges that "Defendants materially breached that duty by

---

[3]      In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

failing to possess and exercise the requisite skill and knowledge throughout their representation of Plaintiff," in nine specific ways.[4]

---

[4]     Specifically, the Complaint alleges that Defendants breached the contract in the following ways:

a.   Defendants failed to follow Plaintiff's express directions to secure his investments in the Nurielle Properties with mortgages and/or titling the properties in an entity owned and controlled by him alone until such time that his initial investment of funds was repaid;

b.   Defendants negligently advised Plaintiff that the operating agreements and other provisions short of a mortgage or a solely-owned entity would fully secure his investment in the Nurielle Properties and that the security-options Plaintiff requested were too complex and costly;

c.   Defendants never advised Plaintiff of any actual or potential conflict arising out of their representation of the Plaintiff in light of their concurrent representation of the Mawardis;

d.   Defendants never advised the Plaintiff of the risks or potential benefits of such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

e.   Defendants never advised the Plaintiff of his right to seek independent counsel prior to entering into or remaining in such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

f.   Defendants never had or even asked Plaintiff to sign a waiver of any actual or potential conflicts, such as the conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

g.   Defendants concurrently represent Plaintiff's interests which were in direct conflict with, and adverse to, that of the Mawardis who ultimately benefited, to Edelsten's detriment, from the lack of documentation and security of Edelsten's investments in the Nurielle Properties;

h.   Defendants failed to adequately protect and represent the interests of Plaintiff in light of their concurrent representation of the Mawardis; and,

i.   Defendants excessively charged Plaintiff for work that was never actually performed on his behalf, was performed with gross negligence, or was performed contrary to the Plaintiff's interests or directions.

(Id. ¶ 27.)

Finally, the Complaint alleges that "[a]s a direct and proximate result of the afore-described conduct of the Defendants, Plaintiff has incurred substantial damages," (id. ¶ 28), including: (a) the loss of millions of dollars that Edelsten invested in or loaned the Nurielle Properites; (b) the loss of monies paid to Defendants for services which were not performed on his behalf, were performed with gross negligence, or were performed contrary to Edelsten's interests or directions; (c) a devaluation of his equity interest as a member of the entities that owned or controlled the Nurielle Properties; and (d) additional attorney's fees and costs Edelsten has incurred to rectify the effects of Defendants' misconduct, (id. ¶ 18).

The Court finds that Plaintiff has sufficiently pled a claim for breach of contract under Florida law.  It alleges (1) a valid contract, (2) a material breach, and (3) damages. See Vozzcom, Inc., 666 F. Supp. 2d at 1327.  Accordingly, Defendants' Motion to Dismiss Count II is denied.

The Court further finds that Count II is not so "so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  Accordingly, Defendants' alternative Motion for a More Definite Statement is also denied.

### b.      Count IV: constructive fraud

"'Constructive fraud is simply a term applied to a great variety of transactions which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud.'"     Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc., 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (quoting Douglas v. Ogle,

85 So. 243, 244 (Fla. 1920)).  "Under Florida law, constructive fraud occurs 'when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken.'"  Id. (quoting Levy v. Levy, 862 So. 2d 48, 53 (Fla. Dist. Ct. App. 2003)).  "Constructive fraud may be based on a misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party."  Levy, 862 So. 2d at 53 (citing Beers v. Beers, 724 So. 2d 109, 116 (Fla. Dist. Ct. App. 1998)).

Defendants argue that the Complaint fails to state a claim for constructive fraud because it does not allege that Defendants "induced reliance" or that Defendants gained an unfair advantage.  (Mot. at 4.)  However, a cause of action for constructive fraud does not require "induced reliance," and it does not necessarily require the Defendant to gain an unfair advantage.  See Levy, 862 So. 2d at 53 (stating constructive fraud "may be based on a misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party").

The Court finds that the Complaint sufficiently states a claim for constructive fraud.  It alleges a fiduciary relationship between Defendants and Edelsten, that Defendants invited Edelsten's "utmost trust and loyalty as his fiduciary and, as a result, Plaintiff reposed the utmost of trust and loyalty in the Defendants."  (Compl. ¶¶ 35-36.)  It further alleges that Defendants intentionally violated Edelsten's trust and confidence, thereby materially breaching their fiduciary duties to Edelsten and constructively

defrauding him in nine separate ways.[5]   It further alleges that this constructive fraud

caused Edelsten damages, as described above.  (See id. ¶¶ 38, 18.)  This is sufficient to

---

[5]    Specifically, the complaint alleges that Defendants constructively defrauded Edelsten by virtue of the following acts:

    a.  Defendants failed to follow Plaintiff's express directions to secure his investments in the Nurielle Properties with mortgages and/or titling the properties in an entity owned and controlled by him alone until such time that his initial investment of funds was repaid;

    b.  Defendants negligently advised Plaintiff that the operating agreements and other provisions short of a mortgage or a solely-owned entity would fully secure his investment in the Nurielle Properties and that the security-options Plaintiff requested were too complex and costly;

    c.  Defendants never advised Plaintiff of any actual or potential conflict arising out of their representation of the Plaintiff in light of their concurrent representation of the Mawardis;

    d.  Defendants never advised the Plaintiff of the risks or potential benefits of such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

    e.  Defendants never advised the Plaintiff of his right to seek independent counsel prior to entering into or remaining in such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

    f.  Defendants never had or even asked Plaintiff to sign a waiver of any actual or potential conflicts, such as the conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

    g.  Defendants concurrently represent Plaintiff's interests which were in direct conflict with, and adverse to, that of the Mawardis who ultimately benefited, to Edelsten's detriment, from the lack of documentation and security of Edelsten's investments in the Nurielle Properties;

    h.  Defendants failed to adequately protect and represent the interests of Plaintiff in light of their concurrent representation of the Mawardis; and,

    i.  Defendants excessively charged Plaintiff for work that was never actually performed on his behalf, was performed with gross negligence, or was performed contrary to the Plaintiff's interests or directions.

state a claim for constructive fraud under Florida law, and therefore Defendants motion to dismiss Count IV must be denied.

The Court further finds that Count IV is not so "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Accordingly, Defendants' alternative Motion for a More Definite Statement is also denied.

### c.    Count V: FDUTPA

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any <u>trade or commerce</u>[.]" Fla. Stat. § 501.204(1) (emphasis added). FDUTPA's stated purpose is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." <u>In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.</u>, 955 F. Supp. 2d 1311, 1331 (S.D. Fla. 2013) (citing <u>KC Leisure, Inc. v. Haber</u>, 972 So. 2d 1069, 1073 (Fla. Dist. Ct. App. 2008)). Defendants argue that Plaintiff has failed to allege that they committed a deceptive act, or that they caused Plaintiff any actual damages. (Mot. at 6.) They further argue that FDUTPA, as a consumer protection statute, does not reach a claim for legal malpractice. (<u>Id.</u> at 6-9.)

--------

(<u>Id.</u> ¶ 37.)

The Court first addresses the threshold issue of whether FDUTPA even applies to the attorney-client issues raised in this case.  Although it appears that the Florida Supreme Court has not weighed-in on the issue, a case from this district provides guidance.  See Kelly v. Palmer, Reifler, & Assocs., P.A., 681 F. Supp. 2d 1356, 1369-77 (S.D. Fla. 2010).  In Kelly, a law firm was retained by retail stores to recoup losses sustained as a result of theft.  Id. at 1361.  Pursuant to state civil theft statutes, the law firm sent demand letters to individuals that had previously been detained for shoplifting in the stores.  Id.  The alleged shoplifters claimed that the demand letters were deceptive, unfair, and oppressive, and sued the law firm under FDUTPA and other states' unfair trade practices statutes.  Id. at 1363.

On the law firm's motion for summary judgment, the court declined to read a per se legal services exclusion into FDUTPA, id. at 1371, but noted that "the usual course of legal practice will not implicate the statute because express prerequisites required to invoke FDUTPA"—specifically, the requirement that the alleged tortfeasor be engaged in "trade or commerce"—"will not ordinarily be satisfied."  Id.  In that regard, the Kelly court held that conduct occurring in the pursuit of legal remedies does not constitute "trade or commerce":

> We recognize that FDUTPA is to be construed liberally.  Yet we find Plaintiffs' attempt to include pre-suit demand letters within the scope of the term "trade or commerce" simply misses the mark.  We will not hold under these facts that soliciting or offering a release in exchange for money is the equivalent of soliciting or offering a "thing of value" under FDUTPA. There is simply no connection or nexus to trade or commerce between these parties through the firm's demand letters.  And absent that important nexus, the entire FDUTPA statutory scheme simply does not apply to these particular circumstances, even if a reasonable juror could find that the

firm's conduct amounted to deceptive conduct. A contrary result would, indeed, expose a great deal of pre-litigation tactics by attorneys to potential exposure under the statute, which is a result not contemplated by the statute. Thus, <u>even though a lawyer's status per se is not a bar to relief (because certainly some lawyers may engage in trade or commercial transactions while acting as lawyers), the particular conduct at issue here does not fall within the statute's umbrella.</u>

<u>Id.</u> at 1376 (emphasis added). It therefore entered summary judgment in favor of the law firm.

Thus, the question becomes whether Defendants' were conducting "trade or commerce" when they committed the unfair and deceptive acts alleged in the Complaint. <u>See</u> <u>id.</u> Under FDUTPA,

> "Trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

Fla. Stat. § 501.203(8). "'Thing of value' may include, without limitation, any moneys, donation, membership, credential, certificate, prize, award, benefit, license, interest, professional opportunity, or chance of winning." <u>Id.</u> § 501.203(9).

The Complaint alleges that Defendants engaged in unfair, deceptive, and/or unconscionable conduct in the following ways:

> a. Defendants failed to follow Plaintiff's express directions to secure his investments in the Nurielle Properties with mortgages and/or titling the properties in an entity owned and controlled by him alone until such time that his initial investment of funds was repaid;
>
> b. Defendants negligently advised Plaintiff that the operating agreements and other provisions short of a mortgage or a solely-owned entity would fully secure his investment in the Nurielle Properties and

that the security-options Plaintiff requested were too complex and costly;

c. Defendants never advised Plaintiff of any actual or potential conflict arising out of their representation of the Plaintiff in light of their concurrent representation of the Mawardis;

d. Defendants never advised the Plaintiff of the risks or potential benefits of such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

e. Defendants never advised the Plaintiff of his right to seek independent counsel prior to entering into or remaining in such conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

f. Defendants never had or even asked Plaintiff to sign a waiver of any actual or potential conflicts, such as the conflicted representation of the Plaintiff in light of their concurrent representation of the Mawardis;

g. Defendants concurrently represent Plaintiff's interests which were in direct conflict with, and adverse to, that of the Mawardis who ultimately benefited, to Edelsten's detriment, from the lack of documentation and security of Edelsten's investments in the Nurielle Properties;

h. Defendants failed to adequately protect and represent the interests of Plaintiff in light of their concurrent representation of the Mawardis; and,

i. Defendants excessively charged Plaintiff for work that was never actually performed on his behalf, was performed with gross negligence, or was performed contrary to the Plaintiff's interests or directions.

(Compl. ¶ 44.)  Plaintiff cites no authority, and the Court has found none, holding that failing to render legal advice, failing to follow a client's instructions, failing to adequately protect a client's interests, or excessively charging a client constitutes "conduct of any trade or commerce," as that phrase is contemplated by FDUTPA.  Fla. Stat. § 501.204(1).

17

In Florida v. Shapiro & Fishman, LLP, the Florida Court of Appeals held that a law firm that allegedly fabricated false documents for use in foreclosure cases was not engaged in "trade or commerce" for purposes of FDUTPA application.  59 So. 3d 353, 356 (Fla. Dist. Ct. App. 2011); see also Law Office of David J. Stern, P.A. v. Florida, 83 So. 2d 847, 850 (Fla. Dist. Ct. App. 2011).  In Economakis v. Butler & Hosch, P.A., the Middle District of Florida held that a law firm misstating attorney's fees and court costs does not constitute "trade or commerce" under FDUTPA.  No. 2:13–cv–832–FtM–38DNF, 2014 WL 820623, at *3 (M.D. Fla. Mar. 3, 2014).

Looking outside of Florida, the Supreme Court of Pennsylvania has held that Pennsylvania's consumer protection statute does not reach attorney misconduct, and noted that "[t]he majority of jurisdictions that have addressed this issue have held that the regulation of attorneys does not fall within the ambit of consumer protection laws." Beyers v. Richmond, 594 Pa. 654, 671 (Pa. 2007) (citing Cripe v. Leiter, 703 N.E.2d 100, 104 (Ill. 1998) ("legislature did not intend to include the furnishing of legal services to clients within the [Consumer Fraud] Act"); Jackson v. Adcock, No. Civ.A. 03–3369, 2004 WL 1900484, at *5 (E.D. La. 2004) ("LUPTA does not regulate the practice of law."); Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1195 (Mass. 1997) (attorneys were not engaged in "trade or commerce" subject to consumer protection act); Averill v. Cox, 761 A.2d 1083, 1089-90 (N.H. 2000); Macedo v. Dello Russo, 840 A.2d 238, 242 (N.J. 2004) (professionals are beyond the reach of the Consumer Fraud Act); Reid v. Ayers, 531 S.E.2d 231, 235-36 (N.C. Ct. App. 2000) (recognizing "learned profession" exemption to unfair trade practices act); Burke v. Gammarino, 670 N.E.2d

18

295, 298 (Ohio Ct. App. 1995) (Ohio Consumer Sales Practices Act "does not apply to transactions between attorneys and their clients"); <u>Kessler v. Loftus</u>, 994 F. Supp. 240, 242-43 (D. Vt. 1997) (claim based upon lawyer's professional judgment not actionable under consumer fraud act); <u>Quinn v. Connelly</u>, 821 P.2d 1256, 1261 (Wash. Ct. App. 1992) (element of Consumer Protection Act requiring that the act occur in trade or commerce "cannot be satisfied by claims directed at the competence or strategy of an attorney"); <u>Ikuno v. Yip</u>, 912 F.2d 306, 312-13 (9th Cir. 1990) (dismissal of claim under Washington's Consumer Protection Act against attorney was proper because claim was based on competence and strategy of attorney).[6]

---

[6]     In <u>Beyers</u>, the Pennsylvania Supreme Court further recognized that: (1) "A minority of jurisdictions has carved out an exception for entrepreneurial aspects of the practice of law, such as advertising and debt collection, while recognizing that claims which allege negligence or legal malpractice are exempt from the consumer protection laws[,]" <u>id.</u> at 660-61 (citing <u>Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin</u>, 717 A.2d 724, 740 (Conn. 1998) (entrepreneurial aspects of the practice of law are covered by the CUPTA, claims of professional negligence do not fall under the CUPTA); <u>Reed v. Allison & Perrone</u>, 376 So. 2d 1067, 1068 (La. Ct. App. 1979) (advertising of legal services is trade or commerce subject to the provisions of the UTPCPL); <u>Guenard v. Burke</u>, 443 N.E.2d 892, 896 (Mass. 1982) (an attorney's use of contingency fee agreements rendered unlawful under state statute may constitute an "unfair or deceptive act or practice"); <u>Kessler v. Loftus</u>, 994 F. Supp. 240, 243 (D. Vt. 1997) (commercial, entrepreneurial aspects of the practice of law include advertising, billing and collection practices, fee arrangements, and methods of obtaining, retaining and dismissing clients); <u>Eriks v. Denver</u>, 824 P.2d 1207, 1214 (Wash. 1992) (legal services do not generally fall within the definition of "trade or commerce," except as those services relate to the "entrepreneurial aspects" of the practice of law); (2) "Courts which strictly adhere to the separation of powers doctrine hold that consumer protection laws do not apply to attorneys[,]" <u>id.</u> at 661 (citing <u>People v. Coria</u>, 937 P.2d 386, 390 (Colo. 1997) (Supreme Court has "inherent, plenary, and exclusive authority to 'regulate, govern, and supervise the practice of law in Colorado and to protect the public'"); <u>In re Infotechnology, Inc. Shareholder Litig.</u>, 582 A.2d 215, 220 (Del. 1990) (Supreme Court "has sole and exclusive responsibility over all matters affecting governance of the Bar"); <u>Averill v. Cox</u>, 761 A.2d 1083, 1088 (N.H. 2000) (court's "comprehensive" regulation of the practice of law "protects consumers from the same fraud and unfair practices" as the state consumer protection act); <u>Vort v. Hollander</u>, 607 A.2d 1339, 1342 (N.J. Super. Ct. App. Div. 1992) ("practice of law in the State of New Jersey is regulated, 'in the first instance, if not exclusively,' by the New Jersey Supreme Court"); (3) some "jurisdictions

Consistent with these cases, the Court finds that "[t]here is simply no connection or nexus to trade or commerce between these parties," and that "the entire FDUTPA statutory scheme simply does not apply to these particular circumstances, even if a reasonable juror could find that the firm's conduct amounted to deceptive conduct." Kelly, 681 F. Supp. 2d at 1376.  Therefore, Count V must be dismissed with prejudice.

## IV.   Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   Defendants' Motion to Dismiss Counts II, IV, and V of Plaintiff's Complaint is **GRANTED IN PART AND DENIED IN PART** consistent with this Order;

2.   Count V of Plaintiff's Complaint is **DISMISSED** with prejudice; and

---

hold that the consumer protection statutes do not apply to the practice of law based upon the existence of regulatory boards[,]" id. (citing Alaska v. O'Neill Investigations, Inc., 609 P.2d 520, 528 (Alaska 1980) (unfair acts and practices exempted from the purview of the UTPA "only where the business is both regulated elsewhere and the unfair acts and practices are therein prohibited") (emphasis in original); Gadson v. Newman, 807 F. Supp. 1412, 1417 (C.D. Ill. 1992) ("medical and legal professions are afforded immunity from the Consumer Fraud Act primarily, because, unlike other commercial services, medical and legal bodies are regulated by governmental bodies"); Lyne v. Arthur Andersen & Co., 772 F. Supp. 1064, 1068 (N.D. Ill. 1991) (legal profession not subject to consumer fraud act because of governmental regulation of the legal profession); Rousseau v. Eshleman, 519 A.2d 243, 245 (N.H. 1986) (professional conduct committee of the Supreme Court is "a regulatory board acting under statutory (and constitutional) authority of this State"); but (4) "Louisiana and Massachusetts hold attorneys liable under the consumer protection statutes based upon the implicit inclusion of professional services in the meaning of trade or commerce[,]" id. at 662 (citing La. Rev. Stat. Ann. § 51-1401-1418; Reed v. Allison & Perrone, 376 So. 2d 1067, 1068-69 (La. Ct. App.1979) (attorneys' advertising is subject to regulation by the state bar association, and subject to the provisions of the UTPCPL); Mass. Gen. Laws Ann. 93A, §§ 1-11; Brown v. Gerstein, 460 N.E.2d 1043, 1052 (Mass. App. Ct. 1984) (practice of law constitutes trade or commerce under the consumer protection law).

**3.**     Defendants shall have fourteen days from the date of this Order to file an

Answer to the Complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida this 18th day of

November, 2015.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

21